**In the Matter of ERIE LACKAWANNA RAILWAY COMPANY, Debtor.**

**No. B72–2838.**

United States District Court,
N. D. Ohio, E. D.
March 18, 1975.

———◆———

Richard Jackson, Vice President Law, Cleveland, Ohio, Harry G. Silleck, Jr., John L. Altieri, Jr., Mudge Rose Guthrie & Alexander, New York City, for Erie Lackawanna Railway Co.

Malvin E. Bank, Alan R. Lepene, William B. Leahy, Thompson, Hine & Flory, Cleveland, Ohio, for First National City Bank and United States Trust Co. of New York.

Carl C. Tucker, Frank C. Heath, William S. Paddock, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for Morgan Guaranty Trust Co. of New York and The Cleveland Trust Co.

Ralph A. Colbert, Marc W. Freimuth, Squire, Sanders & Dempsey, Cleveland, Ohio, for Manufacturers Hanover Trust Co. and Marine Midland Bank-New York.

Fred H. Marcusa, Davis, Polk & Wardwell, New York City, for Morgan Guaranty Trust Co.

Gordon P. MacDougall, Sp. Asst. Atty. Gen., Commonwealth of Pennsylvania, Harrisburg, Pa., for Commonwealth of Pennsylvania.

James Dausch, Asst. Atty. Gen., Civ. Div., U. S. Dept. of Justice, Washington, D. C., for United States of America, Dept. of Justice.

Jerome Sharfman, U. S. Dept. of Trans., Washington, D. C., for U. S. Dept. of Trans.

Harry C. Nester, Earl M. Leiken, D. Frank Frisina, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, Richard K. Kneipper, Chadbourne, Parke, Whiteside & Walff, New York City, for Bankers Trust Co.

Frederick Assini, Calfee, Halter & Griswold, Cleveland, Ohio, for Chemical Bank and First Jersey National Bank..

ORDER NO. 340

Memorandum Re: Document Nos. 957, 990, 992 and 996

KRUPANSKY, District Judge.

The Erie Lackawanna Railway Company (hereinafter EL) has been, and continues to be an integral segment of the National Transportation Systems serving the highly industrialized northeastern United States. Its main line extends between Chicago and New York City. EL operates over 2,800 miles of railroad serving the cities of Marion, Akron and Youngstown in the State of Ohio; Jamestown, Buffalo, Corning, Elmira, and Binghamton in the State of New York; Scranton, Pennsylvania; and Patterson, Newark and Jersey City in the State of New Jersey. Branch lines in Ohio connect such cities as Cincinnati, Dayton and Cleveland to its main line operations while branch lines in New York connect Rochester, Syracuse, Utica and Niagara Falls to the main line.

In addition to serving as a direct link for many of the major metropolitan areas in the states served, EL connects with other railroads permitting its customers to ship or receive from virtually any point in the United States. These important gateways include Chicago with its multi-road connections to most western and southwestern railroads, Cincinnati with its important connections with railroads serving the south, Buffalo interchanging with railroads to service the east and Canada. In addition to its extensive commuter train operation in northern New Jersey and adjacent New York State handling approximately 40,000 commuters per day, the list of 20,000 EL customers covers the entire geographic, production and service spectrum of the national economy. These 20,000 customers ship from or receive at approximately 140,000 different locations.

Although EL is greatly dependant upon the economy of the northeastern United States, conversely the economy of the northeastern United States is also dependent upon Erie Lackawanna. Industry within EL's service area relies upon it to provide an important transportation need and many companies are without available alternative rail transportation. The area benefits further from the existence and preservation of present industry shipping patterns in addition to the annual infusion of approximately $157,000,000 into the area's economy in the form of wages and salaries to approximately 11,000 of its employees and an additional $50,000,000 annually for the purchase of materials and supplies to maintain its operation.

Obvious from the foregoing, EL as the second largest railroad in reorganization operating in the northeast represents an important factor in the national economy and defense.

On June 26, 1972, the EL filed a Petition for Reorganization with the United States District Court for the Northern District of Ohio, Eastern Division, pursuant to § 77 of the Bankruptcy Act, 11 U.S.C. § 205. The action was precipitated by the Debtor's inability to meet its financial commitments on a current basis, attributable in part to the extensive damage to Debtor's property and operations inflicted by the "Agnes" floods of June 1972. Since that time EL has been a railroad in reorganization under § 77 of the Bankruptcy Act.

On April 30, 1974, subsequent to duly noticed hearings conducted on March 27th and 28th of that year and in accordance with the requirements of the Regional Rail Reorganization Act of 1973, (hereinafter referred to as the Rail Act) upon Petition of the Debtor's Trustees supported by convincing and impressive evidence the reorganization Court issued its Order wherein it concluded:

1. EL had the ability to reorganize on an income basis under § 77 of the Bankruptcy Act;

2. The period within which the proposed reorganization could be accomplished, i. e., January 1, 1981, was a reasonable time within the intent and purview of the Act;

3. The public interest would be better served, within the intent and meaning of § 207(b) of the Act, by permitting EL to reorganize under § 77 of the Bankruptcy Act rather than under the Rail Act.

4. The reorganization of EL proceed, in accordance with the findings of fact and conclusion of law herein, under § 77 of the Bankruptcy Act.

The reorganization plan submitted by the Debtor's Trustees in consultation with highly competent and experienced railroad and financial advisors anticipated a relatively stable economy. It was concluded, conditioned upon achievement of projected earnings for 1974 and 1975, that EL could anticipate adequate liquidity to support working capital requirements and sufficient confidence of private lending institutions in its ability to reorganize thus permitting it to obtain necessary private financing for capital improvement to achieve adequate earning power in latter years of the reorganization on which to predicate a fair and equitable capital structure.

Comparative financial statements reflecting actual results of operation with results predicted by EL's 1974 Business Plan available to the Court in early January 1975, together with concern of certain Indenture Trustees expressed in a Petition seeking immediate equitable receivership of the Debtor's estate prompted this Court *sua sponte* in Order No. 329, Document No. 963, dated February 7, 1975, to notice all interested parties of public hearings to commence on February 27, 1975, at which the Court would entertain evidence on:

1. The ability of Erie Lackawanna Railway Company to continue its reorganization efforts on an income basis pursuant to § 77 of the Bankruptcy Act;

2. The legal authority of Erie Lackawanna Railway Company to reorganize pursuant to the Rail Act, and to seek funds thereunder, and the public interest to be served thereby;

3. The Petition of certain Indenture Trustees for an Order dismissing the present reorganization proceedings and to initiate the institution of a receivership and the appointment of receivers of the properties and assets of the Debtor, and to fix a date for cessation of operations by the Debtor, and to grant such further relief as may deem appropriate.

During the progress of the hearings, i. e., on February 28, 1975, an Amendment to § 207(b)(2) (hereinafter referred to as Amendment) of the Rail Act became effective; on March 3, 1975, the Trustees filed Document No. 990:

Petition of the Trustees Pursuant to Section 207(b) of the Regional Rail Reorganization Act of 1973, as Amended, to Reconsider Order No. 234 (Document No. 688) and for an Order Vacating Order No. 234 and Determining that the Reorganization of the Debtor shall be Proceeded with Pursuant to said Act.

and Document No. 992:

Petition of Trustees for Authority to Enter into and Implement Agreements with the Administrator of the Federal Railroad Administration Pursuant to Section 213 of The Regional Rail Reorganization Act of 1973, as Amended.

The issues of fact and law presented by said Petitions, being common to those under consideration by the Court, hearings thereon were included in the then pending proceeding. On March 5, 1975, certain Indenture Trustees filed Document No. 996 styled:

Objection of Certain Indenture Trustees to Action on Petition of Trustees for Authority to Enter into and Implement Agreements with the Admin-

istrator of the Federal Railroad Administration Pursuant to Section 213 of the Regional Rail Reorganization Act of 1973 as Amended (Document No. 992)

Upon the pleadings, testimony of witnesses, exhibits, arguments, and briefs of counsel, the Court finds that the slight improvement in operating results during 1974 over 1973 were substantially below those anticipated at the time of Order No. 234. Deficits in both income available before fixed charges and in net income continue to mount. 1974 had been projected to produce $634,000 in income available before fixed charges, and a reduction of the deficit in net income from $18.6 million in 1973 to $12.4 million in 1974 while 1974 results actually produced a deficit of $3.6 million in income available before fixed charges and a deficit of $17.2 million in the form of net income despite the receipt of $7.8 million in additional revenues resulting from rate increases not anticipated in the 1974 forecast. Freight traffic measured in revenue ton miles dropped 8.5 percent below the results projected for 1974 which represented a decline of 9.1 percent below the 1973 level.

Freight traffic for 1975 is forecast to decline overall by about 5 percent as measured by revenue ton miles and about 5.2 percent as measured by freight revenues at 1974 rate levels. The United States economy is forecast to operate at lower levels in 1975 than last year, and the severely depressed level of economic activity in the first half of the year will be only partially offset by nominal improvements in some sectors during the second half.

The 1975 Business Plan assumes increased employment costs of approximately 13 percent compared with 8 percent anticipated for the same period in the 1974 forecast made a year ago.

Instead of a further improvement in operating results during 1975, sufficient to generate 2 million of income available before fixed charges as projected at the time of Order No. 234, the 1975 Business Plan forecasts a deficit in income available before fixed charges in a magnitude of 9.1 million. That deficit and the deficit of 22.6 million in net income forecast for 1975 are substantially greater than experienced during 1974 or during any year of the reorganization proceedings.

Full implementation of all available cash management techniques inaugurated by the Debtor's Trustees to conserve necessary cash will not result in sufficient cash flow to continue EL's operation much beyond March of 1975. EL's critical cash position has significantly curtailed maintenance of its physical plant placing 35 percent of its main line under "slow order" as compared to 3 percent a year ago.

Derailment expense in 1974 approximated $7,000,000 exceeding derailment expense for the year 1973 by 50 percent. Although the 1975 Business Plan assumes a significant reduction in the amount of derailment expense, this reduction is jeopardized by the current state of maintenance.

EL's principle car repair facility at Meadville, Pennsylvania, has been closed and only necessary running car repairs are now being made at line points.

The rehabilitation of the Marion Yard vital to the successful implementation of Order No. 234 was abandoned for lack of funds.

Critical cash flow adequate to support operating requirements through 1975 cannot be generated without Government assistance and a cessation of operations is imminent. No Federal funds are now readily obtainable by EL for continued operations except those funds provided by the Act as amended.

Accordingly, it is adjudged that EL no longer has the ability to continue its reorganization efforts on an income basis pursuant to § 77 of the Bankruptcy Act.

Certain Indenture Trustees interposed objections of constitutional magnitude to the Amendment asserting that the sub-

stantive and procedural due process afforded by the Rail Act in its original form through the Tucker Act, 28 U.S.C. § 1491, is not afforded to railroads coming under the Rail Act as a result of the Amendment to § 207(b)(2). The thrust of the constitutional challenge arises from the following directory language in the Amendment:

> Whenever a court having jurisdiction over a railroad subject to reorganization under section 77 of the Bankruptcy Act (11 U.S.C. 205) has found, pursuant to a final order under paragraph (1) of this subsection, that the reorganization of such railroad shall not be proceeded with pursuant to this Act, such reorganization court may, upon a petition which is filed within 10 days after the date of enactment of this subsection by the trustees of such railroad, reconsider such order.
> . . .

interpreted as extending discretion to the Debtor's Trustees in requesting reconsideration of the reorganization Court's previously issued Order directing Debtor to reorganize on an income basis under § 77 of the Bankruptcy Act.

██ The effect of discretion placed in the Debtor's Trustees to initiate the proceedings provided by the Amendment to afford the reorganization Court an opportunity to evaluate the ability of the railroad to continue its efforts to reorganize on an income basis, it is argued, renders the remedies held available through the Tucker Act inapplicable to those railroads coming under the Rail Act via the Amendment because the decision of the Debtor's Trustees to invoke the proceedings constitutes their voluntary act as distinguished from a judicially mandated imposition of the Rail Act upon Debtor's estate which is the keystone of the legal justification for affording constitutional due process protections to railroad estates judicially impressed with "conveyance or erosion takings".

Indenture Trustees' interpretation is overly restrictive and concludes a result not intended by Congress. The Amendment represents an expression of Congressional intent and purpose, upon becoming aware of Debtor's inability to reorganize on an income basis, to bring EL within the Government's carefully structured scheme designed to reorganize the northeastern railroad system. The Congressional intent and purpose for amending § 207(b)(2) was knowledge common to all interested parties including the Indenture Trustees. Simply stated, the Amendment is directed to EL and other railroads similarly situated whose good faith attempts to reorganize on an income basis have become frustrated by inflation, deepening recession and other economic forces beyond their control by providing the means for placing such railroads under the Act on the same basis as those railroads originally placed under the Act, thereby assuring their continued operation and reorganization in the public interest. It would appear that the language alluded to is directory in form and provides a procedure whereby the reorganization Court's previously issued Order to reorganize on an income basis pursuant to § 77 of the Bankruptcy Act may be reviewed. The language cannot be construed to foreclose the reorganization Court *sua sponte* as in this case, or upon Motion of any real party in interest, from reviewing a previously issued Order when there is reason to believe the railroad can no longer continue its efforts to reorganize in a manner directed in such previous Order.

The Amendment does, however, mandate that at the conclusion of the hearings on the ability of the Debtor to reorganize on an income basis:

> . . . Such reorganization court shall (i) affirm its previous order or (ii) issue an order that the reorganization of such railroad be proceeded with pursuant to this Act unless it finds that this Act does not provide a process which would be fair and equitable. . . .

■ Having concluded that EL no longer has the ability to reorganize on an income basis pursuant to § 77 of the Bankruptcy Act, the Court orders that Order No. 234 dated April 30, 1974, cannot be affirmed, and that it has no recourse under the mandatory language of Congress, expressed in the Amendment, but to:

. . . (ii) issue an order that the reorganization of such railroad be proceeded with pursuant to this Act unless it finds that this Act does not provide a process which would be fair and equitable.

No purpose would be served herein by reviewing or attempting to embellish the logic and pronouncements of the United States Supreme Court speaking through Justice Brennan in Blanchette v. Connecticut General Insurance Corps., 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), and the Special Court, Regional Rail Reorganization Act of 1973, speaking through Judge Friendly, In re Penn Central Transportation Company, 384 F.Supp. 895 (1974), memorializing the constitutionality of the Rail Act and the fair and equitable process provided thereby. Suffice to say that the conclusions enunciated therein apply equally to the issues in this proceeding.

Absent evidence to support the required negative finding that the Rail Act does not provide a process which would be fair and equitable and applying the pronouncements of *Blanchette, supra,* and In re Penn Central Transportation Company, *supra,* to the evidence at hand, the Court concludes that the Act offers a process which is fair and equitable to this Debtor's estate.

■ In considering the Petition of certain Indenture Trustees for appointment of a receiver and equitable liquidation of EL's estate, the Court's attention is directed to the following language in *Blanchette, supra,* 95 S.Ct. at page 359 wherein it is stated:

*Second,* the Act is a carefully structured method for planning and implementing a reorganization scheme. It necessitates the present denial to the railroads in reorganization of options otherwise available. For example, the New Haven Trustee filed in the District Court a motion to dismiss the § 77 proceeding, and to set up an equity receivership to liquidate Penn Central's assets. So long as reorganization under the Rail Act remains possible, an equity receivership is not available.

Apparent therefrom this Court is without jurisdiction to consider and approve equitable liquidation of the Debtor's estate where an adequate remedy at law is available through the Rail Act.

■ The spector of constitutional infringement is again inferred by certain Indenture Trustees in their objection to the Petition of the Debtor's Trustees for authority to enter into and implement agreements with the Administrator of the Federal Railroad Administration pursuant to § 213 of the Rail Act, as amended (Document No. 992). Objections to the Petition are directed to that portion seeking authorization to enter into certain agreements with the Administrator providing for direct payments by the Administrator of maturing installment obligations under conditional sale agreements and seeking authorization to enter into agreements with the Administrator beyond the amount of $7.3 million currently proposed to be made immediately available to the Debtor. Indenture Trustees urge that since the conditional sale obligations to be paid by the United States will not be extinguished but preserved by the express terms of the proposed agreements, and the United States will be subrogated to the priority position of the conditional sales agreement obligees, the payments by the United States are in economic reality high priority secured loans; that by temporarily relieving the Trustees from the obligation to make payments on the equipment obligations, the loans make an equivalent amount of cash available to the Trustees for use in continuation of the loss operations of the

Debtor's estate and thus produce an equivalent amount of erosion to the assets of the estate which have been pledged to secure the Debtor's existing obligations to the secured bondholders. It is further urged that as a result of the foregoing the interest of the United States as subrogee under the equipment obligations will have the high priority accorded rolling stock obligations by § 77(j) of the Bankruptcy Act, and the bondholders will suffer clearly demonstrable injury.

Summarized, this argument reasserts a form of the "erosion taking" arguments exhausted by the Indenture Trustees in *Blanchette, supra,* which were resolved by the following language, 95 S.Ct. at page 355:

Similarly, "There is no separate provision in [the Rail Act] dealing with the [Tucker Act] remedy; and it does not appear [from the statute or its legislative history] that Congress wished to deny this remedy" if the Rail Act should cause an "erosion taking" that would require the payment of just compensation.

We accordingly hold that the Tucker Act remedy is not barred by the Rail Act but is available to provide just compensation for any "erosion taking" effected by the Rail Act.

Accordingly, it is concluded that:

1. EL no longer has the ability to continue reorganization on an income basis;

2. The process of the Act is fair and equitable to EL's Estate, and provides the same constitutional protection to railroads in reorganization coming under the Act pursuant to the 1975 Amendment as those substantive and procedural protections afforded to those railroads coming under the Act before the effective date of the Amendment including but not limited to:

(a) The availability of the Tucker Act as a remedy to insure payment of "fair and equitable considera-

tion" for any "conveyance taking" under the Rail Act;

(b) The availability of the Tucker Act as a remedy to insure payment of "fair and equitable consideration" for any "erosion taking" under the Rail Act pending implementation of the final system plan;

3. The reorganization of EL shall proceed pursuant to the Rail Act, as amended;

4. The continued reorganization of EL pursuant to the Rail Act, as amended, is in the public interest;

5. Indenture Trustees have not presented sufficient evidence to support their Petition for the appointment of a receiver and immediate equitable liquidation of EL's estate;

6. The Rail Act provides Debtor's estate an adequate remedy at law to the exclusion of equitable liquidation thereof even if the evidence present was of sufficient weight to support such equitable relief;

7. The Trustees are authorized to file applications with the Administrator of the Federal Railroad Administration pursuant to the provisions of Part 253 of Title 49 of the Code of Federal Regulations promulgated under § 213 of the Rail Act;

8. The Trustees are authorized to enter into and to implement one or more agreements with the Administrator of the Federal Railroad Administration pursuant to § 213 of the Rail Act, as amended, in substantially the form filed with the Clerk of Courts, for grants on or before June 30, 1975, in an aggregate amount not exceeding $16 million;

9. The Trustees, or either of them or any of their designees, are authorized to take any action necessary and appropriate to implement and consummate the agreements for

grants. However, the aforesaid agreements are subject to the following conditions:

(a) The Court reserves continuing jurisdiction of these reorganization proceedings including but not limited to the subject matter of agreements for grants and their implementations;

(b) Implementation of agreements by the Debtor's Trustees shall not limit or restrict their rights to take whatever position may be appropriate and/or necessary before this Court or the Special Court created pursuant to § 209(b) of the Rail Act as to the application of any section of the Rail Act in these or any other proceeding;

(c) Approval and implementation of the agreements shall not create precedent as to any further financial assistances under the Act.

It is so ordered.