**In the Matter of ERIE LACKAWANNA RAILWAY COMPANY.**

**No. 75–1.**

Special Court
Regional Rail Reorganization Act.

Argued April 4, 1975.

Decided April 11, 1975.

Malvin E. Bank, Cleveland, Ohio (Alan R. Lepene, William B. Leahy and Thompson, Hine & Flory, Cleveland, Ohio, of counsel), for appellants First National City Bank and U. S. Trust Co. of New York.

Carl C. Tucker, Frank C. Heath, William S. Paddock, Cleveland, Ohio (Jones, Day, Reavis & Pogue, Cleveland Ohio, of counsel), for appellants Morgan Guar. Trust Co. of New York and The Cleveland Trust Co.; Fred H. Marcusa, New York City (Davis, Polk & Wardwell, New York City, of counsel), for appellant Morgan Guar. Trust Co. of New York.

Ralph A. Colbert and Mark W. Freimuth, Cleveland, Ohio (Squire, Sanders & Dempsey, Cleveland, Ohio, of counsel), for appellants Manufacturers Hanover Trust Co. and Marine Midland Bank–New York.

Gordon P. MacDougall, Sp. Asst. Atty. Gen., Com. of Pa. (Robert P. Kane, Atty. Gen., Com. of Pa., of counsel), for appellant Com. of Pa.

James F. Dausch, Dept. of Justice, for appellee U. S.

Harry G. Silleck, Jr., New York City (Richard Jackson, Cleveland, Ohio, John L. Altieri, Jr., Mudge Rose Guthrie & Alexander, New York City, of counsel), for appellee Trustees of Erie Lackawanna Railway Co., debtor.

Lloyd N. Cutler, Washington, D. C. (William R. Perlik, Walter T. Winslow, Jr., Wilmer, Cutler & Pickering, Washington, D. C., and Jordan Jay Hillman, Gen. Counsel, U. S. Railway Ass'n, Washington, D. C., of counsel), for intervenor appellee U. S. Railway Ass'n.

Harry C. Nester, Earl M. Leiken, New York City, D. Frank Frisina, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio (David R. Baker, Richard Kneipper and Chadbourne, Parke, Whiteside & Wolff, New York City, of counsel), for Bankers Trust Co., amicus curiae.

Frederick W. Assini, Cleveland, Ohio, for First Jersey Nat. Bank and Chemical Bank, amici curiae.

Before FRIENDLY, Presiding Judge, and McGOWAN and THOMSEN, Judges.

FRIENDLY, Presiding Judge:

The Erie Lackawanna Railway Company (EL), one of the railroads in the northeastern region which was in reorganization under § 77 of the Bankruptcy Act, was included in the consolidation before this court made by the Judicial Panel on Multi-District Litigation pursuant to § 209(b) of the Regional Rail Reorganization Act (RRRA), *In re Litigation Under the Regional Rail Reorganization Act of 1973*, 373 F.Supp. 1401 (Jud.Pan.Mult.Lit.1974). However, as noted in our opinion of September 30, 1974, 384 F.Supp. 895, 904, Judge Krupansky, supervising the EL's § 77 proceeding in the District Court for the Northern District of Ohio, had entered an order, under the first sentence of § 207(b), finding that EL was "reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. § 205) and that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this Act", *In re Erie Lackawanna Ry.*, 393 F.Supp. 352 (N.D. Ohio, 1974). His conclusions were not contested and the case was not before us.[1]

As a result of adverse economic developments unforeseen when the order (Order No. 234) was entered, EL failed to realize the results projected for 1974. On January 9, 1975, the EL Trustees announced their changed conclusion that EL was not reorganizable on an income basis under § 77 within a reasonable time and their intention to seek an amendment of RRRA that would permit EL to be brought under that Act, as it might initially have been. Less than a

1. This was also the situation with respect to the Boston & Maine Corp., which is in reorganization in a § 77 proceeding before Judge Murray in the District of Massachusetts.

month later a number of EL's Indenture Trustees filed a petition in the district court for an order dismissing the § 77 proceeding in favor of an immediate equity receivership and fixing a date for cessation of operations. About the same time the EL Trustees filed a petition for authority to cease operations because of prospective lack of sufficient cash to meet payrolls and other bills; this petition was later withdrawn in light of the prospect of enactment of the amendatory legislation that would enable EL to be placed under RRRA, which the EL Trustees were seeking. The Trustees announced that if the amendment was adopted they would petition for reconsideration of Order No. 234; the Indenture Trustees sought unsuccessfully to enjoin this. On February 27, 1975, the district court began a hearing to consider the various matters that had been brought to its attention.

The Regional Rail Reorganization Act Amendments of 1975 (RRRAA) became law on the following day, PL 94–5, 89 Stat. 7 (1975). The amendment particularly pertinent here was the addition to § 207(b) of a new section, as follows:

"(2) Whenever it has been finally determined pursuant to the procedures of paragraph (1) of this subsection, that the reorganization of a railroad subject to reorganization under section 77 of the Bankruptcy Act (11 U. S.C. 205) shall not be proceeded with pursuant to this Act, the court having jurisdiction over such railroad may, upon a petition which is filed within 10 days after the date of enactment of this subection by the trustees of such railroad, reconsider such order. Such reorganization court shall (i) affirm its previous order or (ii) issue an order that the reorganization of such railroad be proceeded with pursuant to this Act unless it finds that this Act does not provide a process which would be fair and equitable. The provisions of paragraph (1) of this subsection are applicable in such reconsideration, except that (A) such reorganization court shall make its decision within 30 days after such petition is filed, and (B) any decision by the special court on appeal from such a decision shall be rendered within 30 days after such reorganization court decision is made. There shall be no review of the decision of the special court. · The Association shall take any steps it finds necessary, consistent with time limitations and other provisions of this Act, to effectuate the consequences of such a revised order, including the preparation and submission of any necessary or appropriate supplements to the preliminary system plan".

As permitted by § 207(b)(2), the Trustees of EL filed, on March 3, 1975, a petition asking the district court to reconsider Order No. 234, to find that the processes of RRRA are fair and equitable to the estate of EL, and to determine that reorganization should be proceeded with pursuant to RRRA. The judge considered this and another petition by the Trustees for authority to enter into and implement agreements with the Federal Railroad Administration for emergency assistance pursuant to § 213 of RRRA, as amended, during the ongoing hearings. On March 18, 1975, he rendered his decision. In this (Order No. 340) he concluded, so far as here relevant:

1. EL no longer has the ability to continue reorganization on an income basis;

2. The process of the Act is fair and equitable to EL's estate, and provides the same constitutional protection to railroads in reorganization coming under the Act pursuant to the 1975 Amendment as those substantive and procedural protections afforded to those railroads coming under the Act before the effective date of the Amendment including but not limited to:

(a) The availability of the Tucker Act as a remedy to insure payment of "fair and equitable considera-

tion" for any "conveyance taking" under the Rail Act;

(b) The availability of the Tucker Act as a remedy to insure payment of "fair and equitable consideration" for any "erosion taking" under the Rail Act pending implementation of the final system plan;

3. The reorganization of EL shall proceed pursuant to the Rail Act, as amended;

4. The continued reorganization of EL pursuant to the Rail Act, as amended, is in the public interest;

5. Indenture Trustees have not presented sufficient evidence to support their petition for the appointment of a receiver and immediate equitable liquidation of EL's estate;

6. The Rail Act provides Debtor's estate an adequate remedy at law to the exclusion of equitable liquidation thereof even if the evidence present was of sufficient weight to support such equitable relief.

On March 19, 1975, we entered an order fixing a schedule with respect to any appeals that might be taken. Appeals were taken by the Indenture Trustees and the Commonwealth of Pennsylvania. The EL Trustees and the United States support the decision, as does United States Railway Association (USRA) which we allowed to intervene as an appellee. We also permitted Bankers Trust Company, trustee under certain other EL indentures, to file a brief as *amicus curiae*.[2]

The Commonwealth of Pennsylvania, but not the Indenture Trustees, questions the district court's determination that reorganization under RRRA is in the public interest. We see no reason to question the findings of the district court. In fact these were surplusage since if the court was unable to affirm its previous determination that EL was reorganizable on an income basis within a reasonable time under § 77, as, in view of EL's desperate cash position, it rather clearly was, the court was bound to order reorganization under RRRA unless it found that RRRA did not provide a process that was fair and equitable to EL's estate.

In *In re Penn Central Transportation Company*, 384 F.Supp. 895 (1974) [hereafter "the 1974 opinion"], we concluded that RRRA did afford a fair and equitable process because, but only because, of our conclusion that the estates had a remedy for any otherwise uncompensated taking, whether by "erosion" beyond constitutionally permissible limits or by the compelled conveyance of rail properties, through a suit in the Court of Claims under the Tucker Act, 28 U.S.C. § 1491. See 384 F.Supp. at 928, 941. In the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), the Supreme Court, reversing *Connecticut General Insurance Corp. v. United States*, 383 F.Supp. 510 (E.D.Pa.1974), sustained the constitutionality of RRRA on the same basis. The field of argument open to the Indenture Trustees is thus quite limited.

■ The primary basis of attack is that, whereas in the proceedings before us last fall, under what is now § 207(b)(1), the orders directing reorganization under RRRA would come from the various bankruptcy courts without any request for such an order by the reorganization trustees, proceedings un-

**2.** Bankers Trust Company was joined by First Jersey National Bank and Chemical Bank in this brief. The brief complains of the failure of the EL Trustees and the Indenture Trustees to furnish Bankers Trust Company with information allegedly needed to enable it to determine the best course for the bondholders represented by it. The re-

quested information would obviously take much time and labor to prepare and there is no suggestion that any available information has been withheld. In view of the exigencies with which the district court was confronted, we find no merit in Bankers Trust Company's complaints.

der § 207(b)(2) are triggered by a petition for reconsideration filed by the Trustees. The Indenture Trustees fear that, on this account, as well as because of the acts of the EL Trustees in seeking the amendment, a suit by the EL estate in the Court of Claims to recover "short-falls" for an unconstitutionally compelled erosion or conveyance might be subject to a defense on the ground of lack of taking which would not be available against the § 207(b)(1) estates.[3]

The Indenture Trustees give the petition for reconsideration a far greater significance than it can properly bear. Being understandably doubtful of its power to direct a court to reconsider a previous order (as the bill submitted by the EL Trustees had proposed) or in any event of the propriety of doing so,[4] Congress chose the reorganization trustees, the person most familiar with the debtor's affairs, as the instrument for bringing the question to the attention of the reorganization court. The order directing reconsideration and reorganization under RRRA constitutes action by the court pursuant to a mandate of Congress, not by the trustees, and is no less a taking because the court might not have acted[5] if the trustees had neglected their duty to bring the matter before it. We find equally scant legal significance on the issue of taking in the EL Trustees' efforts to secure legislation that might serve to keep EL a going railroad. The district court had every reason to believe, as it clearly did, that when it directed that EL be reorganized under RRRA, the estate of EL would have the same rights as all other estates. If Congress had meant otherwise, it could and would have said so.

In fact there is clear evidence that Congress did not mean otherwise. The Senate Report, after reciting the earlier district court decisions that EL and the Boston & Maine should not be reorganized under RRRA, said that "in at least one of the cases", which other passages of the report show to be EL, "subsequent events have made income-based reorganization impossible" and the amendment, which would "make reconsideration of that decision possible", would allow "these railroads if necessary, to be brought *fully* under the act." (Emphasis supplied.) Sen.Rep.No.94–5, 94th Cong., 1st Sess. at 2 (1975). It would be a crabbed reading indeed to say that this meant that the two roads should simply come under RRRA without the right of suit under the Tucker Act which the Supreme Court had so recently held not to be foreclosed by RRRA and to be necessary to assure RRRA's constitutionality. After stating that "declining economic conditions have eroded the position" of EL and that its trustees and the Department of Trans-

---

3. In contrast to its position last fall where it forthrightly conceded the availability of the Tucker Act remedy, although questioning whether that would be needed, the United States here contends that the points raised by the Indenture Trustees are not "ripe" for decision by us. Reliance is placed on certain statements in Mr. Justice Brennan's opinion, 419 U.S. 107, 95 S.Ct. 341, which do not seem to us to mean what the Government urges. In any event, as we pointed out last fall, 384 F.Supp. at 919, our mandate is broader than was the Supreme Court's in *Connecticut General.* "We are free, indeed bound, to look down the road" since we must find not only that RRRA is not unconstitutional but that its process is fair and equitable. The filing of the petition for reconsideration is a part of the process of the amended Act, which is now before us. We

consider the issues posed by the Indenture Trustees to be ripe for decision and we shall decide them.

4. A further reason for providing for a petition for reconsideration was that Congress apparently had no information whether or not such reconsideration was desired with respect to the Boston & Maine. It turned out not to be.

5. We say "might" rather than "would" because we are not at all convinced that under § 207(b)(2) a petition by the Trustees is a jurisdictional requirement. Judge Krupansky intimated that, in the absence of a petition by the EL Trustees, he might well have directed reconsideration *sua sponte* in light of his own knowledge of EL's deteriorated condition.

portation "are convinced it is now impossible to reorganize that railroad on an income basis", the Senate Report said, "As a result, it may no longer make sense to consider the Erie Lackawanna apart from the six railroads which have been held to be 'railroads in reorganization' under the act." *Id.* at 4. Still later the report says, *id.* at 6:

> In order to solve the particular problems facing the Erie Lackawanna, this Act provides for a reconsideration of the original Reorganization Court decision under section 207.

The Senate Committee did not think it even worthwhile to mention that this reconsideration was to be triggered by a petition of the reorganization trustees.

The story on the House side is even more compelling. The original House bill (H.R. 2051) did not contain the provision in the Senate bill (S. 281) which included § 207(b)(2) as this was later enacted. John W. Barnum, Acting Secretary of the Department of Transportation, although willing that certain provisions of RRRA be extended to EL to permit it to continue operations until the time of conveyance to Conrail or some other railroad, testified at the House hearings in opposition to the Senate version, which would make the Erie a "railroad in reorganization", because he thought (first as a "possibility" and later, under questioning, seemingly as a certainty) that the United States would thereby be subject to additional potential liability under the Tucker Act. See Hearings on H.R. 2051 and S. 281 Before the Committee on Interstate and Foreign Commerce, House of Representatives, 94th Cong., 1st Sess., at 20, 31, 43, 45, 93, 102 (1975). Chairman Arthur Lewis of USRA, which thought it would be advantageous to have EL a "railroad in reorganization" in order to permit more effective planning, acknowledged that, with adoption of the Senate version, "initial Tucker Act exposure" would be increased "by roughly no more than the ratio that Erie Lackawanna's rail properties transferred under section 303 bears to the totality of properties so transferred, including those of the vastly larger Penn Central system," although he thought inclusion of EL might have a positive effect on the viability of Conrail. *Id.* at 160. See *id.* at 161–62 (response of Jordan Jay Hillman, General Counsel to USRA). Ralph S. Tyler, Jr., a trustee of EL, testified, in support of the Senate version, that EL sought the same treatment as any other road that was unable to reorganize itself and suggested that, rather than doing EL any favors, Congress would merely be treating it the same as other roads. *Id.* at 206, 216, 218. Representative Hastings of New York suggested, *id.* at 219, that he could see no reason for treating the Penn Central one way and the Erie another. At one point Representative Heinz of Pennsylvania threw out for purposes of discussion with Mr. Barnum the possibility that the Erie be permitted to reorganize under the Act but with a waiver, should it so elect, of any Tucker Act recovery. Mr. Barnum suggested that this would be "a rather desperate hope" since the election would have to be made not simply by the EL trustees but "by all the creditors," *id.* at 94, and the possibility was given no further discussion. With all this before it, the House Committee recommended adoption of the Senate version with respect to § 207(b), H.R.Rep.No.94–7, 94th Cong., 1st Sess. (1975).[6]

---

6. We see no contrary indication in the statement by Representative Staggers on the floor of the House:

> We have made other changes in the 1973 act through H.R. 2051, all designed hopefully to promote the reorganization process. We provided a mechanism for the Erie Lackawanna Railroad to reorganize under the 1973 Rail Act, if their court decides to al-

low it. Some were bothered about the Supreme Court's December 1974 decision which would expose the U.S. Government to a possible Tucker Act claim in regard to the 1973 Rail Act. We do not believe that any such claim will be upheld in any courts of claim, and secondly, we do not feel that by allowing the reorganization court overseeing the Erie-Lackawanna reorganization

We are thus completely convinced and hold that neither the legislative effort of the EL Trustees nor their filing of the petition for reconsideration in the district court deprives the EL estate of a remedy under the Tucker Act that would otherwise have been available.[7] Indeed the availability of the Tucker Act remedy is much clearer now than when we and the Supreme Court passed upon it. In contrast to the silence on the subject when RRRA was enacted, there is abundant evidence that, in adopting the Amendments, Congress had the Tucker Act very much in mind. It was well aware of the Supreme Court's decision, 419 U.S. at 125–28, 95 S.Ct. at 349–51, 42 L.Ed.2d at 343–44, in line with our own, 384 F.Supp. at 942, that the Tucker Act remedy would be available unless Congress clearly manifested an intention that it should not be. Despite this and our intimation, 384 F.Supp. at 955, that Congress could still withdraw the United States' waiver of immunity, although thereby rendering RRRA unconstitutional, the Amendments and the legislative history will be searched in vain for any indication that Congress intended to eliminate the Tucker Act remedy for any railroad being reorganized under RRRA.

■ A secondary point urged by the Indenture Trustees is that, however confident we may be in the lack of basis for their fears that by seeking legislation and petitioning for reconsideration the EL Trustees may have waived a Tucker Act remedy, we cannot be certain that the Court of Claims would agree or that the Supreme Court would reverse it if it found otherwise on the waiver point. They add that even if we were to hold, as we came near doing last September, 384 F.Supp. at 955–57, that our decision would work as a collateral estoppel against the United States in the Court of Claims, we could not be sure that that court or the Supreme Court would agree. And on this occasion we do not have "the hope of a solution", 384 F.Supp. at 957, that was furnished last fall by the prospect of an early Supreme Court decision on the very issue that was before us, a decision which would be a precedent binding the Court of Claims whether a collateral estoppel or not.

The argument ignores how different the situation now is from that with which we were confronted last fall. We regarded the Tucker Act issue that was then before us as "close", 384 F.Supp. at 942. Moreover, although we knew our own minds, we could not ignore the fact that three other judges had reached a contrary conclusion in the *Connecticut General* case, 383 F.Supp. 510 (E.D.Pa. 1974). Now any doubts on the broad issue have been dispelled by the decision of the Supreme Court. The point here before us is an exceedingly narrow one, and, although the Indenture Trustees have done their duty in raising it, we do not consider it close at all. While there are no absolute certainties in this life, there are few legal prophesies of which we would be more certain than that a tribunal of the distinction of the Court

to change their mind and allow the E–L to come under the 1973 act provisions will further expose the Treasury to potential losses. The Supreme Court ruled only that interested parties have a right to sue under the Tucker Act—they did not say, nor did they prophesy whether the claims courts would indeed honor those claims. Our committee under no circumstances would ever have amended the 1973 act in any fashion to include the Erie-Lackawanna if we for a moment felt that this adds an additional liability for the Government. The intent was simply to: First, help bankrupt carriers in the region which are vital to achiev-

ing the overall profitability of the new ConRail: and second, make the planning process for the new ConRail much easier. 121 Cong.Rec. H848–49 (daily ed., Feb. 19, 1975). While this passage reflects Representative Staggers' belief that the compensation under the Act will be adequate, it does not suggest that the EL was to have a different status than the other roads under the Tucker Act if it turned out not to be so.

7. All parties agree that issues as to what amounts, if any, may be recoverable are not before us.

of Claims would agree with us on the point here decided (assuming, which we somewhat doubt, that it was legally free to do otherwise) or, on the remote chance of its disagreement, that correction would come from above. That is enough.

Order No. 340 of the District Court for the Northern District of Ohio directing that EL be reorganized under RRRA is affirmed.