In the Matter of the CENTRAL
RAILROAD COMPANY OF
NEW JERSEY.

B. No. 401–67.

United States District Court,
D. New Jersey.

March 31, 1976.

Wilmer, Cutler & Pickering by Reuben Clark, William T. Lake, and Richard A. Allen, Washington, D. C., for United States Railway Association.

Pepper, Hamilton & Scheetz by Laurence Z. Shiekman, Philadelphia, Pa., and Lum, Biunno & Tompkins by James C. Orr, Newark, N. J., for Conrail.

Jerome E. Sharfman, Dept. of Transp., Washington, D. C., for U. S. Dept. of Transp.

Stanley Weiss, Newark, N. J., for R. D. Timpany, trustee.

Thomas E. Tisza, Acting Gen. Counsel, Cent. R. Co. of New Jersey, Newark, N. J., for Cent. R.

Pitney, Hardin & Kipp by Roger C. Ward, Morristown, N. J., for indenture trustee.

Stryker, Tams & Dill by Stephen H. Knee, Newark, N. J., and Thomas Morrison (N. Y. Bar), for interline committee.

Jacob I. Goodstein, New York City, for 3¼% Mortgage Bondholders Committee.

Lamb, Hutchinson, Chappell, Ryan & Hartung by Raymond J. Lamb, Jersey City, N. J., for B & O and C & O.

O'Brien, Daaleman & Liotta by Carmine J. Liotta, Elizabeth, N. J., for Penn Cent. Trustee.

## OPINION

WHIPPLE, Chief Judge.

This matter comes before the Court on the United States Railway Association's (hereinafter referred to as "USRA") petition for an Order for Identification of Cash and Other Current assets pursuant to Section 211(h)(3) of the Regional Rail Reorganization Act of 1973, as amended, 45 U.S.C. § 721(h)(3). See Order No. 816. A hearing was held on March 23, 1976. Decision was reserved. The Court has also had the benefit of pre- and post-hearing briefs and memoranda of law.

Because the facts relating to this particular railroad in reorganization have weighed heavily in the Court's determination of the issues presented, a brief historical recapitulation is in order. The Central Railroad Company of New Jersey (hereinafter referred to as "CNJ"), filed for bankruptcy pursuant to Section 77 of the Bankruptcy Act, 11 U.S.C. § 205 et seq., on March 22, 1967. The next seven years were devoted to an attempt to reach a viable reorganization plan.

The Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 et seq. (hereinafter referred to as the "RRRA"), became Public Law 93–236 on January 2, 1974. The purpose of this legislation was "to salvage the rail services operated by seven insolvent class I railroads in the Midwest and Northeast region of the Nation . . . by replacing them with a new and viable rail services system." U.S. Code Cong. & Admin.News, 1973, Vol. 2, p. 3242. The means by which Congress hopes to achieve its purpose is the Consolidated Rail Corporation (hereinafter referred to as "ConRail"), a private, for profit, state-incorporated corporation. See also Regional Rail Reorganization Act Cases, 419 U.S. 102, 109–17, 95 S.Ct. 335, 341, 42 L.Ed.2d 320, 334 (1974); In re Penn Central Transp. Co., 384 F.Supp. 895, 904–910 (Sp.Ct.1975); In re Penn Central Transp. Co., 533 F.2d 1347, 1354 Nos. 75–1902, etc. (3d Cir. 1976) (dissenting opinion of Gibbons, Cir. J.). All rail properties designated in the Final System Plan, see 45 U.S.C. § 716, will be transferred to ConRail or other designated entities at midnight on March 31, 1976. 45 U.S.C. § 743. Substantially all of the CNJ's rail properties have been designated for transfer in the Final System Plan.

Although ConRail will take portions of seven bankrupt railroads,[1] the bankruptcy of the Penn Central was the impetus behind the passage of RRRA. See *In re Penn Central Transp. Co.*, 384 F.Supp. 895, 902–903 (RRRA Court, 1974); *U.S. Code Cong. & Admin.News*, 1973, Vol. 2, pp. 3245 and 3246–54. The papers submitted by ConRail and USRA indicate that their model for negotiations with all railroads is the Penn Central.

Sec. 207(b)(1) of the RRRA required the reorganization courts to decide whether the bankrupt railroads were reorganizable within a reasonable time under Section 77 of the Bankruptcy Act, 11 U.S.C. § 205. In Memorandum and Order No. 661, issued on April 30, 1974, the Honorable Anthony T. Augelli, United States District Judge, held that the CNJ was not reorganizable, under Section 77. He held as follows:

> That no reorganization of the Debtor on an income basis can be effected within a reasonable time is *obvious* in light of the record in this case. The Debtor, since 1958, has suffered continuous losses in each year of its operations, totaling more than $100,000,000.00. During the period of reorganization (from 1967–1973) these losses have exceeded $60,000,000.00. The losses continued in 1974 at increased levels. . . . Projections beyond February, according to the Trustee, show continued cash and income losses. These losses have resulted in an erosion of the assets of the Debtor . . . (emphasis added)

Memorandum and Order No. 661, p. 6. Section 207(b)(1) also required a ruling as to whether a railroad unreorganizable under Section 77 should be reorganized under the RRRA. On June 28, 1974, Judge Augelli held that the RRRA "does not provide a process which would be fair and equitable to the estate of the Debtor." Memorandum and Order No. 684, p. 10.

Order No. 684 was stayed pending appeal to the Special Court, pursuant to Section 207(b)(1). Order No. 685, July 15, 1974. The Special Court reversed Judge Augelli, upheld the RRRA, and remanded for entry of an Order for reorganization under the Act. *In re Penn Central Transp. Co., supra*, 384 F.Supp. at 954–955. See also *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

As a railroad in reorganization pursuant to the RRRA[2], the CNJ was and is required to maintain rail service until 11:59 p. m. on March 31, 1976, other law to the contrary notwithstanding. Section 304(f) of the RRRA, 45 U.S.C. § 744(f); *Regional Rail Reorganization Act Cases, supra*, 419 U.S. at 116–17, 95 S.Ct. at 345, 42 L.Ed.2d at 337; *In re Erie Lackawanna Ry.*, 393 F.Supp. 352, 358 (N.D.Ohio 1975). While the RRRA does provide for financial assistance for the continuation of rail service, Sections 213 and 215 of RRRA, those funds have proved inadequate. See Opinion filed December 18, 1975. Despite this inadequacy, the operation was required to continue.

> \* \* \* [I]nterim operations of the railroad at a loss may constitutionally be continued because the United States will be required to indemnify the creditors and stockholders for interim erosion of the debtor's estate in an action in the Court of Claims. \* \* \*

*In re Penn Central Transp. Co.*, 508 F.2d 270, 273 (3d Cir. 1975). There can be little question that an erosion of the CNJ estate has taken place. See Memorandum and Order No. 661, *supra*.

There is no need to recount all the details of the struggle to keep the railroad in operation.[3] That struggle is about to end. Conveyance to ConRail is not far off. The matter now before the Court involves post-conveyance problems. The Court must now concern itself with the orderly administra-

---

1. CNJ, Penn Central, Lehigh Valley, Lehigh & Hudson River Railway, Reading, Ann Arbor Railroad and Erie-Lackawanna.

2. RRRA supplements and modifies Section 77 to the extent necessary to effectuate its pur-

pose. 45 U.S.C. § 791(d). See *In re Penn Central Transp. Co.*, 533 F.2d 1347, No. 75–1902, etc., *supra*.

3. See, e. g., the Opinions of December 18, 1975 and January 8, 1976.

tion of the remainder of the CNJ estate.[4] Fortunately, the questions of valuation and erosion compensation must be decided by other judges. See Section 209 of the RRRA, 42 U.S.C. § 719.

Section 211(h) was added to the RRRA by the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. 94–210, Section 606. Section 211(h)(1) provides for loans from USRA to ConRail to allow ConRail to pay certain obligations of the reorganization railroads in order to avoid a disruption in "ordinary business relationships." Section 211(h)(2) provides for an agency agreement [5] between the bankrupt railroads and, in most cases, ConRail.

Section 211(h)(3), the subject of this hearing, requires the reorganization courts, upon petition by USRA, to issue an order which:

(a) identifies that cash and other current assets of the estate of such railroad which shall be utilized to satisfy obligations of the estates identified in paragraph (1) of this subsection; and

(b) provides for the application by the trustees of such railroads and their agents, *consistent with the principles of reorganization under section 77 of the Bankruptcy Act (11 U.S.C. 205)* and with the agency agreement .. . ., of all such current assets, including cash available as of or subsequent to such date of conveyance, to the payment in the post conveyance period of the obligations of the estates identified in paragraph (1) of the subsection. (emphasis added)

USRA has petitioned the Court for such an order.[6]

Section 211(h)(4) provides procedures for the identification of obligations to be paid under paragraph (1). It also provides that the amounts paid with USRA loans by ConRail on a debtor's behalf, plus interest thereon, shall be administrative expenses. Paragraph (5) of the subsection provides, in part, that such claims are *not* subject to any sort of setoff, cross-claim, or counterclaim. In addition, the paragraph gives such claims a high priority.[7]

The agency agreement between ConRail and CNJ has not yet been reached. If the parties are unable to reach such an agreement, the Court is required by the statute to prescribe the terms of the agreement. The agency agreement shall be "for the processing of all accounts receivable and accounts payable attributable to operations prior to the conveyance of property." [8] Section 211(h)(2).

In oral argument, counsel for the trustee and ConRail agreed that, before the paragraph (3) order can be issued, the Court must determine whether or not the trustee or his agent may make preferential payments of administrative expenses. Once this question is answered, counsel have indicated that the agency agreement can be negotiated with some ease. (Transcript of 3/23/76, pages 32–34.)

The trustee argues that there is a substantial possibility that the estate will be unable to pay all of its administrative expenses. Using USRA figures with some modifications, the trustee estimates that the estate will have approximately $25,000,000.00 to pay administration expenses of $55,000,000.00.

---

4. It remains to be decided whether there will be a reorganization or liquidation of the reduced estate.

5. The nature of the agreement will be discussed below. The agency agreement is needed because a large portion of the CNJ bookkeeping staff will be working for ConRail after conveyance. Thus, ConRail will be in a better position than the CNJ to process many of the accounts.

6. USRA has agreed that the Court may designate assets for the payment of other non-para-

graph (1) obligations, pursuant to the terms of the agency agreement.

7. This Court has no jurisdiction to determine the constitutionality of the "super priority" or the interest connected with § 211(h)(1) loans. Section 209 of RRRA. Until another court holds to the contrary, this Court must apply those provisions as written.

8. As indicated in footnote 8, these may include obligations not mentioned in paragraph (1) of subsection (h).

The government vigorously opposes the trustee's contention. Two witnesses[9] were questioned at the hearing. The Court is unable to make a specific finding of fact based upon the record before it. At this point, the figures available are only estimates. The Court does find, however, that there is, at least, a real *possibility* that the administration expenses will not be met in total. The Court feels compelled to proceed with this possibility in mind.

 There can be no doubt that, under normal circumstances, the administrative expenses of a Section 77 reorganization must be paid in full or on a pro rata basis. 11 U.S.C. § 205(*l*) and 11 U.S.C. § 104(a)(1).

\* \* \* Indeed, it is frequently held that there can be no priority among debts in the same class. *In the Matter of Columbus Ribbon Co.*, 117 F.2d 999 (3d Cir. 1941). See 3A Collier on Bankruptcy, (14th Ed.), ¶ 64.02[4].

*In re Penn Central Transp. Co.*, 325 F.Supp. 294, 298 (E.D.Pa.1970), aff'd, 452 F.2d 1107, 1108 (3d Cir. 1971)

In fact, the Third Circuit has held that the general equitable powers of a court of bankruptcy may not alter the statutory scheme.

\* \* \* The court may not by granting a priority which it deems equitable set aside the clear congressional mandate that *no* such priority shall be accorded. \* \* \* (emphasis added)

*In the Matter of Columbus Ribbon Co.*, 117 F.2d 999, 1002 (3d Cir. 1941)

The Court may not set up a subclassification of priority within a statutory class. *Columbus Ribbon, supra.*

 There is a "rule of necessity" which allows for the immediate payment of some administrative expenses and the deferral of others. Those expenses which must be paid if the reorganization is to continue are to be paid, while other claims may be deferred if their payment would hamper the reorganization. *In re Penn Central Transp. Co.*, *supra*, 452 F.2d at 1108–1109. In that case, the reorganization court allowed the trustees to defer payment of certain post-bankruptcy taxes, which were administrative claims. In affirming, Chief Judge Seitz, writing for the court, noted that the rail operations of the Penn Central would be endangered by payment of the taxes, thus defeating the reorganization. He cited *Continental Illinois National Bank & Trust Co. v. Chicago Rock Island & Pacific Ry.*, 294 U.S. 648, 676, 55 S.Ct. 595, 606, 79 L.Ed. 1110, 1128 (1935), for the proposition that to prevent the attainment of the object of Section 77, a reorganization, is "to render its provisions futile."

Chief Judge Seitz also noted that

\* \* \* Appellants do not point to any record basis which would suggest that ultimately the company's assets will be inadequate to meet in full the reasonably foreseeable first priority claims. [citation omitted.] \* \* \*

*In re Penn Central Transp. Co., supra*, 452 F.2d at 1109. Such a situation, possibly present in this case, would clearly be a factor to consider in determining the operation of the "rule of necessity" in a reorganization proceeding.

The trustee argues, in his response to USRA's Statement of Position, that the "rule of necessity" can only apply to the post-conveyance operations of the CNJ estate, i. e., management of real estate, litigation, and development of a plan of reorganization. Pp. 17–18. Because CNJ's rail operations will cease on April 1, 1976, the trustee reasons that the post-conveyance continuance of rail operations is of no concern to the estate for the purpose of the "rule of necessity".

USRA admits that all administrative claims have "equal first priority". USRA Statement of Position, p. 5. USRA argues, however, that CNJ must pay those obliga-

---

9. Robert Frederickson, a CNJ consultant, and R. D. Timpany, the trustee, testified. The trustee's production of information pursuant to Order No. 816(1)(6) was introduced as Exhibit T–1.

tions which are required "to permit continuation of rail service while other claims of equal rank may be deferred." *Id.* In other words, USRA wants CNJ to pay some obligations now to avoid disruption of ConRail's rail service.

■ This Court cannot accept USRA's argument that the "rule of necessity" requires CNJ to pay some obligations immediately in order to avoid disruption of ConRail's operations, especially when there is at least a possibility that CNJ will not pay all of its administrative claims. If the "rule of necessity" applies anywhere under these circumstances, it applies to those expenses necessary to continue the management and reorganization of the post-conveyance CNJ estate. The continuation of ConRail's operations is not and ought not be a factor in that reorganization.

The Court must now examine Section 211(h) of the RRRA to determine whether that statute requires the CNJ to meet the obligations in question.

Section 211(h) was added to the RRRA in February of this year. The subsection was not included in the Senate Bill, S. 2718, but was added by House amendment.

> The House Amendment also authorized section 211 loans to be made to ConRail, . . ., for the payment of certain obligations of the railroads in reorganization, where such payments were necessary to permit continued, orderly operations. The provision was designed to provide some assurance of a source of continuing payments to employees, shippers, suppliers and others within the framework of the loan program. * * * *U.S. Code Cong. & Admin.News,* 1976, Vol. 1, p. 199
> * * * Loans can be made to ConRail . . . to enable them to pay obligations of the bankrupt carriers in a timely fashion that avoids any disruption, in orderly business relationships. However, *this provision does not relieve the bank-*

*rupt carriers from the ultimate responsibility for these obligations and ensures that they will be paid as promptly as possible as administrative claims in each bankruptcy court.* * * * (emphasis added) Id. at p. 147

The subsection was designed to meet the projected post-conveyance shortfall which was the subject matter of the hearings held before this Court on December 1 and 3, 1975 and January 13, 1976. See Opinion of December 18, 1975 and oral Opinion of February 4, 1976.

■ Paragraph (1) provides, in pertinent part, as follows:

> (1) The Association [USRA] is authorized . . . to enter into loan agreements . . . with the Corporation [ConRail] . . . under which the Corporation . . . will agree to meet existing or prospective obligations of the railroads in reorganization in the region which the Association . . . determines should be paid by the Corporation . . . on behalf of the transferors, in order to avoid disruptions in ordinary business relationships. . . .

The remaining portions of the paragraph limit the types of obligations which may be paid with the USRA loans. The obvious legislative intent was to have as few obligations as possible paid with the USRA loaned money. This paragraph, however, does *not* mandate the payment of such obligations without the consent of the bankrupt railroad.[10]

Paragraph (1) must be read in conjunction with paragraph (2). That paragraph mandates an agency agreement between CNJ and ConRail. As *agent,* ConRail is to process accounts receivable and accounts payable. As USRA points out at page 3 of its statement of position, "ConRail has no duty to the debtor to expend its own funds on the debtor's obligations. [footnote omitted]." Nor does the CNJ have a duty to expend its funds to protect ConRail's busi-

---

10. USRA *seems* to concede this at page 2 of its Post-Hearing Memorandum. In any event, the language of the statute cannot be read to mandate such payment.

ness relationship, at least when its assets are so low.

■ The drafters of Section 211(h) foresaw that some of the estates would be unable to make immediate payment of all of their pre-conveyance rail operation administrative expenses. Section 211(h) makes funding available to pay some of those obligations, but only when immediate payment is to ConRail's advantage. ConRail's claim is not only substituted for that of the entity paid, Section 211(h)(4)(C), but it is given a priority over other administrative expenses,[11] Section 211(h)(5)(B). Thus, if ConRail pays an obligation with loan funds, it or USRA must be repaid before other administrative claims. If there are not enough funds to pay all other claims in toto the creditor paid by ConRail will have received a preference.

Paragraph (3) provides another mechanism for ensuring that the use of USRA loans is kept to a minimum. USRA may petition the reorganization court, as it has done in this case, for an order applying certain of the railroad's assets to the payment of the obligations described in paragraph (1). The more assets applied to such payment by the court, the less USRA loan money needed to pay such obligations as ConRail and USRA want paid.[12]

It is specifically required, however, that the Section 211(h)(3) order be made "consistent with the principles of reorganization under section 77 of the Bankruptcy Act (11 U.S.C. 205)." This Court has already discussed the two primary principles of reorganization which relate to payment of administrative expenses. They are the rule that such expenses be paid in full or pro rata and the "rule of necessity."

■ The Court cannot read the statute to require the payment of administrative claims in a preferential manner when there is a substantial possibility that the estate will be unable to pay all administrative

claims. Had Congress intended such a great departure from settled bankruptcy practice, it would have expressed such intent in clear and unambiguous language. It has not done so. The priority provision of paragraph (5)(B) does not indicate a contrary intent. This provision protects those loan funds which are actually used to pay railroad obligations. If the estate is subsequently unable to pay all claims, the government funds will be paid before all other expenses except trustee's certificates. An intent to protect government funds does not reflect an intent to require the estate to make a potentially preferential payment. Instead, Congress allowed the reorganization courts to exercise their discretion, guided by the Section 77 principles of reorganization. It is clear that this Court cannot substitute its judgment for that of Congress. Where Congress has specifically given discretion to the individual reorganization courts, however, such discretion must be exercised in a manner consistent with the particular factual situation of the railroad involved.

The Third Circuit has held that

\* \* \* [t]he section 77 trustees and the reorganization court have not been relieved of their responsibility to consider and deal equitably with all claimants who have an interest in the . . . estate.

\* \* \* *In re Penn Central Transp. Co.,* 533 F.2d 1347, 1352, Nos. 75–1902, etc., *supra.*

Once conveyance has relieved the CNJ of rail operation responsibilities, the prime responsibility of the trustee and this Court will be the reorganization or liquidation of the estate. *If* there were no shortage of assets, the Court would be inclined to use current assets to pay the pre-conveyance operating expenses. Such indirect aid to ConRail would be in the public interest and consistent with the intent of the statute. Under the circumstances of this case, however, such action would be harmful to the

---

11. Except trustee's certificates.

12. This process is also to the benefit of railroads, such as the Penn Central, which have sufficient current assets to pay all obligations.

Those railroads seek to avoid the interest payments on USRA loan funds by paying as many obligations as possible with current assets.

estate and inequitable to the pre-bankruptcy claimants and the administration claimants.

The Court does not view the amounts collected by the CNJ for other railroads as administration expenses. These are trust funds. All current interlines must be paid over as soon as practicable. *In re Penn Central Transp. Co.,* 486 F.2d 519 (3d Cir. 1973), *cert. denied,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974).[13] The Court is not persuaded by the Committee of Interlines' argument that the other obligations owing to them must be paid immediately. While the creditor's need for reimbursement is an important factor in determining whether an administration expense is deferred, the primary concern is the reorganization estate itself. See *In re Penn Central Transp. Co., supra,* 375 F.Supp. at 300–301. All non-trust fund obligations must await payment until the post-conveyance situation has been evaluated.

This Court's Orders No. 792 and 800 required the escrowing of certain withholding amounts. Those funds, to the extent actually escrowed, are trust funds. *United States v. Randall, supra,* is not to the contrary. In this case there was actual escrowing, in the *Randall* case there was not. Such funds should be paid over to the proper entities.

Exercising the discretion required by Section 211(h)(3), the Court will require the Trustee to submit an order designating sufficient current assets, as defined by the trustee, including such receivables as may be collected by ConRail as agent, to pay those obligations which the Court has held must be paid because they are trust funds. The trustee may also provide for the payment of those obligations which must be paid in order to continue the post-convey-

ance reorganization. The Court is unwilling to strip the estate of assets needed for continued administration. The Court is also of the opinion that potentially preferential payments should not be made until there has been an opportunity to assess the post-conveyance situation.

Because the Court must apply the priority and interest provisions of Section 211(h) as written,[14] the Court will not sanction the use of USRA loan funds to pay any obligation except those described in the previous paragraph. To pay other obligations with such funds would, as the statute presently stands, constitute a preference.

The Court is particularly concerned about employee wage and vacation claims. The trustee has argued that some of those obligations may belong to ConRail by virtue of Section 504 of the RRRA, 45 U.S.C. § 774.[15] Evidently the ConRail payroll will continue where the CNJ payroll stops. ConRail will be paying on a current basis, while the CNJ had been paying two weeks behind. Thus, there will be no gap in the employee's receipt of wages, although there will be wages owing. Such being the case, there will be time to study the wage and vacation problem in an orderly fashion after conveyance.[16]

All other problems alluded to at the hearing should be dealt with in an orderly manner after conveyance. There has hardly been sufficient time to deal with the *novel* issues raised by the necessity of issuing a Section 211(h)(3) order. The Court cannot and will not attempt to resolve all the issues pressed upon it in such a short period of time.

The Court favors the type of agency agreement proposed by the trustee. That form allows for the flexibility needed in the

---

**13.** This is not the type of trust fund theory disallowed by *United States v. Randall,* 401 U.S. 513, 91 S.Ct. 1991, 28 L.Ed.2d 273 (1971). While withholding tax can be characterized as an administration expense, interline collections cannot be. As the *Penn Central* case makes clear, the interline collection system is one of practical convenience.

**14.** See footnote 9.

**15.** See, e. g., pages 16–21 of the trustee's Post-Hearing Brief.

**16.** The Court will resolve such questions as quickly as they are brought before the Court for full adjudication.

present situation. The Court will sign the trustee's proposed Order as soon as it has been amended to reflect the rulings made herein.